# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN D. WARREN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 4:07CV625 CEJ |
| | ) | |
| DON ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. After reviewing the case, the Court has determined that petitioner is not entitled to relief. As a result, the petition will be dismissed.

## Background

Petitioner was convicted by a jury on three counts of first-degree murder and three corresponding counts of armed criminal action. Resp. Exh. 2 at 4, 50, 84-89. The state court sentenced petitioner to life without parole on the murder counts and life with parole on the armed criminal action counts, with the three life-without-parole sentences imposed consecutively. Resp. Exh. 2 at 706-07. Petitioner is currently incarcerated in the Potosi Correctional Center.

The facts of petitioner's underlying criminal case, as recited by the Missouri Court of Appeals, are as follows:

Late in the evening of March 14, 2001, Glenn Robinson ("Glenn") went to visit his cousin, Herbert, in the latter's apartment. Herbert, a drug-dealer, lived on the ground floor of a two-family flat in the City of St. Louis with his girlfriend, Ronetta Simmons ("Ronetta") and her three children. Glenn lived in the apartment on the second story of the same two-family flat with his girlfriend and children. Glenn fell asleep while watching television waiting for Herbert. Glenn briefly woke up and noted that Herbert was in the room, but returned to sleep.

In the early hours of the morning of March 15, 2001, Glenn awoke to the sound of the front door being loudly opened, and saw Herbert fall on the floor, grappling with a man, later identified as Torin [Dyson],[1] atop him, striving for control of a gun. Glenn went to aid Herbert and observed another man with a gun in his hand, [Warren], standing in the doorway, who told him to get back into Herbert's living room. Herbert continued to grapple with Torin on the floor. Glenn tried to enter the hallway again and was warned by [Warren] to get back or he would be killed. Glenn tried to enter the hallway a third time when he heard Ronetta screaming, and again [Warren] told him to retreat or he would kill him. Glenn again retreated, but reentered the hallway when Ronetta continued to scream, and told her to get back in the room. [Warren] pointed the gun at Glenn's head and told him not to stick his head out again or he would kill him.

Glenn again went back into the living room. He heard Torin ask [Warren] for help, telling him to shoot Herbert, to which [Warren] replied "I can't. You in the way." Glenn then observed [Warren] approach Herbert and strike him repeatedly on the head. Glenn tried to enter the hallway a fifth time, but [Warren] turned, pointed the gun at him, and told him to get back. Glenn complied, retreating as far back in the living room as he could. He heard a shot, whereupon he ducked behind the couch, looked up and saw Herbert fall back, heard a number of shots and ducked back down. After a while, Glenn emerged from his hiding place and saw the Herbert bleeding from his wounds. He noticed the gun over which Herbert and Torin had struggled in the hallway, picked it up and noted that it had

---

[1]Torin Dyson was tried separately and convicted. State v. Dyson, 130 S.W.3d 617 (Mo. Ct. App. 2004).

no clip. Glenn spoke with the police after they arrived, and subsequently identified [Warren] and Torin in line-ups. Police recovered twelve bullet casings from the scene, a number of bullets from the body of Herbert, and a fingerprint from the front door handle. Neither the bullets nor the casings came from the gun found by Glenn. An autopsy showed that Herbert had been shot twelve times, once in the chest, once in the hip, once in the perineum, and nine times in his right thigh. The police laboratory determined that the seven bullets recovered from Herbert's body all came from the same gun, and also that all of the shell casings came from the same gun.

Several weeks after Herbert's murder, on April 1, 2001, Helena and her three children returned to their home in the City of St. Louis which they shared with Helena's boyfriend, Dirk, a drug-dealer, after an evening that Helena and her children had spent with her family. Dirk was not home at that time. Helena spoke with her sister between 10:30 p.m. and 10:45 p.m. Aigner Murphy ("Aigner"), Helena's oldest daughter, fell asleep in her mother's bedroom, and was awakened by a stranger. The stranger and another person sent her to her brother's room, and later brought her baby sister there as well. Aigner heard the strangers, [Warren] and Torin, talking about money, with one saying that he knew there was over a thousand dollars there. Aigner fell asleep, but woke up when she heard the door open and Dirk's voice, and yelling and crying. The stranger who had carried her baby sister into the room came back and removed the Sony PlayStation and some games. Subsequently Aigner heard gunshots, but went back to sleep.

In the morning, Aigner found the bodies of Helena and Dirk, and called her grandmother, who told her to call the police. The police found the bodies face down, their heads covered with pillows with bullet holes in them. They recovered several shell casings and a live bullet from the living room. The police discovered that the house had been roughly searched and was in disarray. Autopsies showed that both Helena and Dirk had been shot several times. A bullet was recovered from Helena's hand, and several bullet fragments were recovered from Dirk's body. Tests determined that the casings recovered at Helena's residence were all fired from the same gun. Tests also showed that the gun used to fire

these shell casings also fired the shell casings found at Herbert's home. Further, tests showed that bullet recovered from Helena's hand had been fired by the same gun that fired the bullets recovered from Herbert's body.

At trial, Ronetta testified that she was living with Herbert on March 15, 2001, and that he made his living as a drug-dealer. She stated that she went to sleep early that evening, and woke up when she heard arguing. She stepped into the hallway and saw two men whom she could not identify and Herbert. She said from her vantage she could see Glenn standing in the living room doorway. Ronetta stated that she fled through the back door and down the alley to her nearby cousin's house when one man pointed a gun at her. She testified that while at her cousin's house she heard "a lot" of gunshots. She returned to her home after the police arrived, sometime near 3:00 a.m.

Glenn testified to the events as previously set forth. He stated that he viewed a lineup for the police on April 12, 2001, and that no one influenced him when he viewed the lineup. Looking at a photo of the lineup that he saw, Glenn stated that he identified Torin at the lineup on April 12, 2001, as the man who grappled with Herbert on the night of March 15, 2001. Glenn further testified that he looked at a different lineup on August 10, 2001, and that he was able to make an identification at that lineup as well. He stated that the man he identified at that lineup was the man with the gun in the doorway. Glenn examined a photo of the lineup, and said that it accurately reflected the lineup that he viewed on August 10, 2001. Glenn then made an in-court identification of [Warren] as the man who pointed the gun at him on the night of March 15, 2001.

Officer George Ratermann ("Officer Ratermann"), a police evidence technician, testified concerning the evidence that he gathered and preserved at the crime scene on the morning of March 15, 2001. He stated that he collected twelve shell casings and one live round at the scene, which he packaged for evidence. He also testified that he was able to take a latent fingerprint and a relift fingerprint from the outside of the storm door of Herbert's home, which he also marked and preserved for later identification.

Officer Raymond Oberschlep ("Officer Oberschlep"), a latent fingerprint examiner for the police, testified that the fingerprints collected by Officer Ratermann from the crime scene on March 15, 2001 matched the lift index fingerprint of [Warren] in a side-by-side comparison. Officer Oberschlep stated that he had no doubt in his mind that the fingerprints matched, and that no two people have the same fingerprints. Officer Oberschlep discussed the standard fingerprint identification procedures used, which included having his identification of the fingerprints re-examined by another qualified latent fingerprint examiner. This other examiner confirmed the match between the samples taken by Officer Ratermann and the print of [Warren]'s left index finger.

Officer Dennis Conway ("Officer Conway"), who works in the firearms and tool mark identification section of the police laboratory, testified that the dozen shell casings recovered from the March 15, 2001 crime scene all came from the same gun, which was not the gun found by Glenn. Officer Conway also stated that the expended bullets, and the identifiable fragments recovered from Herbert's body came from the same weapon, which was not the gun found by Glenn. Officer Conway said that his work and expert opinion was checked by Frank Stubits ("Stubits"), who agreed with his conclusions.

Randi Cohns ("Randi") testified that she knew [Warren], Torin, and Herbert, having bought drugs from Herbert. She stated that in the evening of March 14, 2001, [Warren] asked her to take him to Herbert's home to purchase drugs. She could not do so at that time. Randi said that later, in the early hours of the morning on March 15, 2001, [Warren] called her and asked her to meet him at Tower Grove Park. She stated that she drove by Herbert's home on her way to meet [Warren] and observed that many police were there. Randi testified that she met [Warren] and Torin at the park, and told [Warren] what she had seen on her way there. She stated that she then asked [Warren] what had happened. She averred that he told her that he and Torin had gone to Herbert's home and asked to purchase some drugs, and that during the deal he had pulled a gun on Herbert. Randi stated that [Warren] also told her that Herbert and Torin somehow started to fight, and that he had shot Herbert after seeing them struggle over a gun. She said that he also told her that there had been a

man in the living room during the struggle, as well as woman in the kitchen armed with a weapon. She averred that [Warren] had said that he did not expect that Herbert would fight, and he asked her to go back over to Herbert's house to see what was happening.

Regarding the murders of Helena and Dirk, Officer Richard Booker, Jr. ("Officer Booker"), assigned to the evidence technician unit of the police, testified about the crime scene, and what was done to preserve and recover evidence. He stated that six shells and one live round were recovered at the scene, which were preserved and marked as evidence. Officer Booker said that the house was in disarray, with a number of objects overturned, including the washer and dryer, with insulation ripped from the basement ceiling.

Dr. Jane Turner ("Dr. Turner"), an assistant medical examiner for the City of St. Louis, testified that she performed the autopsies on Herbert, Helena, and Dirk. She stated she recovered bullets and fragments of bullets from the respective bodies, which were preserved and marked as evidence. Dr. Turner stated that Herbert had lacerations of the head along with bruising and swelling consistent with blunt force injury.

Stubits, a retired City of St. Louis police officer working as a firearm and tool mark examiner for the crime laboratory of the City of St. Louis Police Department, also testified. Stubits stated that he examined the shell casings recovered from the April 2, 2001 crime scene, and determined that they were all fired from the same gun. He also compared those shell casings to those recovered from the March 15, 2001 crime scene, and concluded that all of the shell casings from both crime scenes had been fired by the same weapon. Stubits stated that he compared the bullet recovered from Helena's hand with the bullets recovered from Herbert's body. He averred that there were sufficient striations on two of the bullets recovered from Herbert's body that he could positively state that they were fired from the same gun as that which fired the bullet recovered from Helena's hand. Stubits stated that the results of comparing the bullet from Helena with the others from Herbert's body were "inconclusive," which meant that while the specimens were consistent as to "caliber, the number of six lands and grooves, the rifling[,]" there were not sufficient markings

on the other bullets recovered from Herbert's body to permit him as a firearms expert to state that they were positive matches.

Aqueelah Beyah ("Aqueelah") testified that in March and April 2001 she was the girlfriend of Torin, and that she knew [Warren] as well, whom she identified in the courtroom. She stated that she knew Dirk through Torin, and knew that Dirk sold heroin. Aqueelah testified that sometime prior to April 2, 2001, Torin told her that he was going to rob Dirk, literally that he was "going to do a lick" and kill him because Dirk would not supply him with drugs when Torin did not have sufficient money.

Aqueelah testified that she saw [Warren] and Torin at her apartment after April 2, 2001. She stated that she left with Torin to buy heroin, and she asked him what happened with Dirk. She averred that Torin replied, "You know what I did." She stated that after they returned to her apartment, Torin left, but [Warren] remained. She said that [Warren] had a duffle bag with him. Aqueelah stated that she looked into the duffle bag and saw that it contained two guns, "Play Station cartridges and stuff like that[,]" a video camera, and some videotapes. She testified that [Warren] "had a nice little amount" of money with him when he was at her apartment, and that he continued to stay at her home for approximately two weeks thereafter. Aqueelah stated that [Warren] told her that he and Torin had put pillows over the heads of Dirk and Helena and killed them, and that Helena had been wearing nightclothes. She also said that [Warren] asked her to dispose of the duffle bag.

Several other witnesses testified. A number of exhibits were introduced into evidence including tapes of Aqueelah's interviews with the police, numerous photographs, documents, and physical evidence. The State of Missouri ("State") and [Warren] stipulated that [Warren] had pleaded guilty to three 1998 charges of tampering in the first degree, all of which occurred at the same time. The trial court orally found [Warren] to be a prior offender.

State v. Warren, 141 S.W.3d 478, 482-86 (Mo. Ct. App. 2004) (footnote omitted).

## Grounds for Relief

The petition raises three grounds for relief:

1. That trial counsel was ineffective for failing to use expert fingerprint examiner to refute state's evidence.

2. That trial counsel was ineffective for failing to object when state's fingerprint expert testified that his findings were confirmed by another examiner, who did not testify at the trial.

3. That trial counsel was ineffective for failing to independently depose state's witnesses Glenn Robinson and Randi Cohns.

**Procedural Bar**

Respondent argues that petitioner's grounds for relief are procedurally barred because petitioner did not raise them in his appeal from the denial of his post-conviction relief motion. Petitioner responds that although the claims were not raised by his counsel in the appellate brief, he properly presented the claims to the appellate court because he filed a pro se supplemental brief in which the claims were raised.

To avoid defaulting on a claim, a petitioner seeking habeas review must have fairly presented the substance of the claim to the state courts, thereby affording the state courts a fair opportunity to apply controlling legal principles to the facts bearing on the claim. Wemark v. Iowa, 322 F.3d 1018, 1020-21 (8th Cir. 2003) (quotation marks omitted). A claim has been fairly presented when a petitioner has properly

raised the same factual grounds and legal theories in the state courts that he is attempting to raise in his federal petition. Id. at 1021.

The United States Court of Appeals for the Eighth Circuit held in Clemmons v. Delo, 124 F.3d 944 (8th Cir. 1997), that the petitioner, who was represented by counsel, had properly presented his claims to the Missouri Supreme Court because he had attempted to raise them in a pro se supplemental brief. The Missouri Supreme Court denied the petitioner's request without comment. Id. at 948. The Eighth Circuit noted that there was no rule or Missouri Supreme Court case that specified in what circumstances a petitioner who was represented by counsel could file a pro se brief. Id. Under the rule that a "procedural rule must be regularly adhered to if it is to be an adequate state ground supporting a procedural bar," the claims raised in the petitioner's pro se brief were preserved for federal habeas review.

In this case, petitioner raised the same three grounds for relief as are raised in the instant petition in his motion for state post-conviction relief. Resp. Exh. 7 at 19, 20, 23. At the hearing, petitioner preserved his arguments relating to grounds two and three; however, he expressly waived his argument relating to ground one of the instant petition. Resp. Exh. 6 at 4; Resp. Exh. 7 at 19, 32. The motion for post-conviction relief was denied on May 27, 2005. Resp. Exh. 7 at 2, 30-34. Petitioner filed a notice of appeal on June 27, 2007. Id. at 2. Counsel was appointed for petitioner, and his

appellate brief was filed on January 27, 2007. Resp. Exh. 8. The appellate brief raised only a single issue: that counsel was ineffective for failing to object to the jury instructions. Petitioner filed a pro se supplemental brief, which was received by the Missouri Attorney General's office on May 15, 2006. Resp. Exh. 10. The Missouri Court of Appeals issued its order affirming the denial of petitioner's Rule 29.15 motion on May 16, 2006. Resp. Exh. 11.

Petitioner argues that by filing the pro se supplemental brief on May 15, 2006, he properly presented his claims to the state courts pursuant to Clemmons. Petitioner is incorrect. This case is distinguishable from Clemmons because the Missouri Court of Appeals for the Eastern District of Missouri has promulgated a procedural rule barring the filing of pro se briefs by parties represented by counsel. Mo. Ct. App. E.D. R. 380; see also Hall v. Luebbers, 296 F.3d 685, 695 n. 4 (8th Cir. 2002) (recognizing that the Missouri intermediate appellate courts prohibit the filing of pro se briefs where the party is represented by counsel). As a result, petitioner's claims were not properly presented to the Missouri courts and are procedurally barred from federal habeas review. Moreover, petitioner expressly abandoned his argument pertaining to ground one of the instant petition during the hearing on his motion for post-conviction relief. For these reasons, the petition should be dismissed in its entirety because it is procedurally barred.

## Merits of Claims

"In the habeas setting, a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions." Lomholt v. Iowa, 327 F.3d 748, 751 (8th Cir. 2003). Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law or . . . decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. At 407-08. Finally, a state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings only if it is shown that the state court's presumptively correct factual

findings do not enjoy support in the record. 28 U.S.C. §2254(e)(1); Ryan v. Clarke, 387 F.3d 785, 790 (8th Cir. 2004).

All of petitioner's claims allege ineffective assistance of trial counsel. To prevail on an ineffective assistance of counsel claim, petitioner must fist establish that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 694, 700 (1984). Judicial scrutiny of counsel's performance is "highly deferential," and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

In Blackmon v. White, 825 F.2d 1263, 1265 (8th Cir. 1987), the United States Court of Appeals for the Eighth Circuit stated that "the courts must resist the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed . . . and his best judgment as to the attitudes and sympathies of the judge and jury." Furthermore, "[t]he fact that the choice made later proves to have been unsound does not require a finding of ineffectiveness." Id. [I]t is not enough to complain after the fact . . . when in fact the strategy at trial may have been reasonable in the face of an unfavorable case." Id. (citing Strickland, 466 U.S. at 690); see also Shaw. v. United States, 24 F.3d 1040, 1042 (8th Cir. 1994) (trial counsel's reasonable trial strategies cannot constitute

ineffective assistance, even if they are unsuccessful); Henderson v. Norris, 118F.3d 1283, 1287-88 (8th Cir. 1997) (matters of trial strategy are presumed correct), cert denied, 522 U.S. 1129 (1998).

Even if a petitioner shows that counsel's performance was objectively unreasonable, he must also show that the deficient performance prejudiced his defense. Winfield v. Roper, 460 F.3d 1026, 1033 (8th Cir. 2006). "This requires proving that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to [petitioner]." Id. "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" Id. (citing Wiggins v. Smith, 539 U.S. 510, 534 (2003)). "Merely showing a conceivable effect is not enough. [Petitioner] must demonstrate that there is a reasonable probability that absent counsel's inadequate representation, the jury would not have [convicted him]." Id.

## Discussion

**Ground 1**

During the hearing on petitioner's motion for post-conviction relief, petitioner expressly abandoned the argument he raises in ground one of the instant petition. Resp. Exh. 6 at 4; Resp. Exh. 7 at 19, 32. As a result, no testimony was adduced as to counsel's strategy at trial regarding hiring an independent fingerprint expert or what prejudice petitioner may have suffered as a result of counsel's strategy. In

consequence, there is no basis in the record for the Court to discuss the merits of this ground, and petitioner is not entitled to relief on this ground because it has been abandoned.

**Ground 2**

In ground two of the petition, petitioner argues that trial counsel was ineffective for failing to object when state's fingerprint expert testified that his findings were confirmed by another examiner, who did not testify at the trial. Respondent concedes that trial counsel's failure to object was not a reasonable trial strategy. Respondent argues, however, that petitioner has not demonstrated that he was prejudiced as a result of the failure to object.

During the criminal trial, the following testimony was elicited from Raymond Oberschelp, the government's fingerprint expert:

> Q: And are you able to tell us as an expert that the fingerprint . . . lifted by Officer Ratermann is the fingerprint of Brian Warren comparing it with the known rolled ink fingerprint?
>
> A: Yes, sir.
>
> Q: Is there any doubt about that in your mind?
>
> A: No, sir.
>
> . . .

> Q: Now in the laboratory your job, if you determine that there is a positive match, that one fingerprint matches another, are there any procedures to check your work?
>
> A: Yes, there is.
>
> Q: What are those procedures?
>
> A: I present my work to another qualified latent fingerprint examiner. I would have him re-examine the case and see if he comes to the same conclusion that I came to.
>
> Q: Okay. And if your conclusions were different, what would be the result?
>
> A: There would not be an identification.
>
> Q: Was your worked checked in this case?
>
> A: Yes, it was.
>
> Q: Was there an identification?
>
> A: Yes, there was.

Resp. Exh. 1 at 328-30.

Petitioner's trial counsel did not object to the testimony as being inadmissable hearsay. During the hearing on petitioner's motion for post-conviction relief, trial counsel testified that he did not see anything objectionable in the line of questioning recited above. Resp. Exh. 6 at 30.

The state post-conviction court found that petitioner's trial counsel would have had a valid hearsay objection regarding the second fingerprint examiner's validation of Oberschlep's opinion. The court, however, found that petitioner had failed to demonstrate that the failure to raise the objection prejudiced the outcome of petitioner's case. Resp. Exh. 7 at 32-33.

The state court's finding is not contrary to, or an unreasonable application of, clearly established federal law. Where there is overwhelming evidence of guilt, the failure to make a valid objection at trial does not constitute ineffective assistance of counsel. E.g., Irons v. Lockhart, 741 F.2d 207, 209 (8th Cir. 1984). In this case, there was abundant evidence, apart from the hearsay statement of the second fingerprint expert, which the jury could have relied on to find petitioner guilty. As a result, petitioner is not entitled to habeas relief on ground two of the petition.

**Ground 3**

In ground three of the petition, petitioner argues that trial counsel was ineffective for failing to independently depose state witnesses Glenn Robinson and Randi Cohns. Respondent argues that petitioner has not shown that counsel's decision was not reasonable trial strategy.

Trial counsel was unable to attend scheduled depositions of Glenn Robinson or Aqueelah Beyah. Resp. Exh. 6 at 33. Counsel did, however, obtain transcripts of the

depositions, which he reviewed before the trial. Resp. Exh. 6 at 33. Additionally, counsel attended the trial of Torin Dyson, which occurred before petitioner's trial, and listened to Robinson's and Beyah's testimony. Id.

The post-conviction court denied petitioner's motion for relief on this ground finding that petitioner had failed to show that counsel's actions were deficient or that he was prejudiced by counsel's actions. Resp. Exh. 7 at 33. Specifically, the court found that because counsel had obtained the deposition transcripts and attended the trial, he knew what the witnesses' testimony would be. Id.

The state court's finding is not contrary to, or an unreasonable application of, clearly established federal law. Although counsel had a well recognized duty to investigate petitioner's case, petitioner has not shown how counsel's actions failed to fulfil that duty. Petitioner has not specified what information counsel could have and should have elicited from Robinson or Beyah had he attended the depositions. Petitioner merely speculates that had counsel attended the depositions, he could have elicited "critical information." Traverse at 6. The post-conviction court showed the proper deference owed to counsel's trial strategies under federal law. Trial counsel was in position to know whether the testimony in the transcripts was sufficient for the purposes of cross-examination and impeachment. Petitioner's mere assertions have failed to overcome the "strong presumption that counsel's conduct [fell] within the

wide range of reasonable professional assistance." Strickland, 466 U.S. at 689 As a result, petitioner is not entitled to habeas relief on ground three of the petition.

## Conclusion

Each of the grounds presented in the instant petition are procedurally barred. Additionally, the petition fails on the merits. In consequence, the Court will deny the petition. Additionally, the Court will not issue a certificate of appealability because petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly,

**IT IS HEREBY ORDERED** that petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **dismissed**.

**IT IS FURTHER ORDERED** that no certificate of appealability shall issue. 28 U.S.C. § 2253.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 28th day of April, 2008.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE